FILED

2004 JUL 19 P 1:46

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STANLEY CHANCE<br>Plaintiff | : |
| v. | : CASE NO. 3:03CV 40 (JCH) |
| DAVID CUNDY, ET AL<br>Defendant | :<br>: JULY 15, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FACTS:

On or about August 18, 2002, DAVID CUNDY (hereinafter referred to as "Cundy") came to the Fairfield Police Department to report that he was receiving harassing phone calls from the plaintiff, STANLEY CHANCE (hereinafter referred to as "Chance"). Cundy spoke with OFFICER KEVIN WELLS (hereinafter referred to as "Wells"). Cundy advised Wells that Chance had met his son, NICK CUNDY (hereinafter referred to as "Nick"), while Nick was working at Great Cakes in Westport, Connecticut. Cundy further advised Wells that on August 12, 2002, Chance called his son at home. Cundy told Wells that he spoke with Nick's boss at Great Cakes, who said he would talk with Chance's boss and ask him to instruct Chance not to call the Cundy home anymore. Cundy next advised Wells that Chance called his home twice on August

16, 2002. Cundy requested that Wells contact Chance and ask him not to call the Cundy home anymore. On August 18, 2002, Wells contacted Chance via telephone. Wells advised Chance that Cundy did not want him calling his home anymore (see telephone transcript attached to Complaint).

On or about February 4, 2003, Cundy reported to the Fairfield Police Department that he believed Chance came to his home to deliver a summons and complaint on February 3, 2003. Cundy reported that his son Nick had seen a silver livery-type vehicle exiting his driveway. Cundy further advised the police that he believed Chance worked for a local livery service. On February 5, 2003, Cundy reported that his administrative assistant received a phone call, at his place of employment, from a caller identifying himself as "Stanley". Cundy advised the police that the caller stated that Cundy should call him if he wants to do business. In response to Cundy's complaints, an SPRC check was run on Chance. The SPRC report revealed that chance had fifteen (15) prior arrests for a variety of crimes, including Burglary, Arson, and Assault on a Police Officer. On February 6, 2003, LIEUTENANT CHRISTOPHER LYDDY (hereinafter referred to as "Lyddy") contacted Chance by telephone. Lyddy requested that Chance come to the police station to meet with one of the detectives. On said date, Chance appeared at the Fairfield Police Department. Chance met with DETECTIVE PETER BRAVO

(hereinafter referred to as "Bravo"). Bravo questioned Chance as to whether he had been to the Cundy residence on February 3, 2003, or if he had phoned Cundy at work. Chance denied contacting Cundy. Chance advised Bravo that a Marshall served Cundy with the summons and complaint. Bravo contacted the Federal Court Clerk's office and confirmed that the Chance v. Cundy lawsuit had been filed and was delivered to the Cundy residence by a Marshal service. The interview was terminated and Chance left the building.

On or about September 6, 2002, Chance filed a pro se action against David and Eetitila Cundy. On or about February 21, 2003, Chance filed an amended complaint against the Town of Fairfield and several employees of the Fairfield Police Department, including Bravo. On June 25, 2004, this Court granted in part, and denied in part, the municipal defendants' Motion to Dismiss the plaintiff's Complaint. The Court denied the municipal defendant's Motion to Dismiss the purported seizure claim alleged against Bravo. The Court granted the municipal defendant's motion as to the remaining allegations of the Complaint addressed to them. Bravo now moves this Court for summary judgment as to the claim for false arrest.

LAW:

The party moving for summary judgment has the burden of establishing that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). See also Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986). In considering a Rule 56 motion, the Court's responsibility is not to resolve disputed issues of fact, but rather to assess whether there are, or are not, any factual issues to be tried, while resolving all ambiguities and drawing all reasonable inferences against the moving party. See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-50.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment.

ARGUMENT:

Bravo is entitled to summary judgment as to the plaintiff's claim that he seized him, as Bravo had reasonable suspicion upon which to warrant an investigative stop, or in the instant case, an interview of Chance to determine if he had violated Connecticut General Statute §53a-107. Connecticut General Statute §53a-107 provides in relevant part:

> (a) A person is guilty of criminal trespass in the first degree when: (1) Knowing that such person is not licensed or privileged to do so, such person enters or remains in a building or any other premises after an order to leave or not to enter personally communicated to such person by the owner of the premises or other authorized person . . .

The Second Circuit has held that:

[There are] Two categories of seizures of the person implicating the protection of the Fourth Amendment have emerged in the caselaw. The first, an "investigative detention" or a *Terry* stop, employs "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," and can be supported by reasonable suspicion, instead of probable cause. Florida v. Royer, 460 U.S. at 500, 103 S.Ct. at 1325; *see also* United States v. Seelye, 815 F.2d 48, 50 (8th Cir. 1987); United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989) ("investigative detentions, involve[ ] reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave.") As the level of intrusiveness rises, however, an encounter between the police and a citizen is more properly categorized as an arrest

— the second category of seizures of the person. "If the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause." Hastamorir, 881 F.2d at 1556; *see also* United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986) ("an arrest, is a seizure characterized by [a] highly intrusive or lengthy search or detention"); Seelye, 815 F.2d at 50 ("if the force used exceeds these limits, an investigators 'stop is concerted into an arrest."). Posr v. Doherty, 944 F.2d 91, 98 (2nd Cir. 1991)

In Kent v. Katz, 312 F.3d 568 (2d Cir. 2002), the Second Circuit held:
A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest. See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."), cert. denied, 517 U.S. 1189 (1996)." Id. at 573.

"Probable cause exists 'when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" Roberts v. City of Amsterdam, 303 F. 3d 155, 159 (2nd Cir. 2002), (quoting Golino v. City of New Haven, 950 F. 2d. 864, 870 (2d Cir. 1991)). In determining whether police officers had probable cause to make an arrest, courts examine the totality of the circumstances. See, e.g., Bernard v. United States 25 F.3d 98, 102 (2nd Cir. 1994).

Based upon the indisputable facts of the case, it is clear that Bravo had, at a minimum, a reasonable suspicion upon which to question Chance, and arguably probable cause to believe Chance may have committed criminal trespass. On August 18, 2002, Cundy contacted the Fairfield Police Department to report he was receiving harassing phone calls from Chance. (Lyddy Aff. ¶ 7.) Chance admits that he had called the Cundy residence on more than one occasion, though he denies that these calls were harassing in nature. (Compl. ¶12.) On August 18, 2002, Wells contacted Chance and advised him that Cundy did not want him to call his residence anymore. (Compl. ¶ 26.)

On February 4, 2003, and February 5, 2003, Cundy contacted the Fairfield Police Department alleging Chance had attempted various forms of contact at his residence and place of employment. (Lyddy Aff. ¶¶ 9,14). Specifically, Cundy reported that on February 3, 2003, he had received a civil summons and complaint filed by Chance. Cundy believed Chance had personally delivered it because his son, Nick Cundy, saw a silver livery vehicle exiting the driveway to their home. Cundy believed Chance worked for a local livery service. Cundy also reported that on February 5, 2003, he received a phone message at work from a man identifying himself as "Stanley." The individual stated that Cundy should call if he wanted to do business. Bravo had no reason to doubt Cundy's veracity in filing these complaints against chance. (Bravo Aff. ¶ 23.) A criminal

background check ordered by the Fairfield Police Department revealed Chance had been arrested fifteen times (15) and that he was currently on probation. (Lyddy Aff. ¶ 11.) Based upon the fact that Chance had been warned not to contact Cundy anymore, the statements made by Cundy, and Chance's criminal background check, Lyddy felt there was reasonable suspicion to investigate the allegations and interview Chance. (Lyddy Aff. ¶ 10.) (Bravo Aff. ¶ 9.)

The within complaint alleges that on February 6, 2003, the plaintiff contacted Lyddy in response to a message he left with the plaintiff's employer. (Compl. ¶ 41.) On said date, Lyddy asked the plaintiff to come to the Fairfield Police Department to meet with an investigator regarding complaints filed by Cundy. (Lyddy Aff. ¶ 16.) Lyddy assigned Bravo to interview Chance when he appeared at the police station. (Lyddy Aff. ¶ 17.) Bravo met with Chance for twenty minutes. (Compl. ¶ 47.) (Bravo Aff. ¶ 21.) Upon interviewing Chance, viewing the vehicle he was driving and contacting the US Federal Court to confirm Chance's statement as to who delivered the summons and complaint, Bravo concluded that Chance had not been to the Cundy's home on February 3, 2003.

Based upon the aforementioned facts, it was objectively reasonable for Bravo to believe there was not only reasonable suspicion to question Chance, but arguably

probable cause to interview Chance as to whether he had trespassed onto the Cundys' property, after being warned by the police not to make contact with the Cundys.

Furthermore, Bravo used the least intrusive means reasonably available to verify or dispel his suspicion that the plaintiff had committed criminal trespass. As discussed above, the plaintiff was called and asked to come to the police station. The plaintiff came to the police station at his convenience. (See ¶38 March 2003 Compl.) The plaintiff was interviewed for a short period of time. The interview with Bravo lasted no more than twenty minutes. The plaintiff left the police station at the conclusion of the interview. If this Court finds that Bravo's actions were based upon a reasonable suspicion or probable cause, then Bravo is entitled to summary judgment as to the allegation that he violated the plaintiff's Fourth Amendment right to be free of unreasonable search and seizure.

Alternatively, Bravo is entitled to summary judgment, as the instant matter is barred by the doctrine of qualified immunity. A government official, or in the instant case a police officer, is protected from civil liability under the doctrine of qualified immunity. The Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), stated that: "[i]n a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the

proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier, 533 U.S. at 200; see also Schiff v. Kerrigan, 625 F. Supp. 704, 708 (D.Conn 1986) ("question of qualified immunity can readily be decided on summary judgment").

In Smith v. City of New Haven, 166 F.Supp.2d 636 (2001), this Court granted the defendant's motion for summary judgment based upon qualified immunity. The Smith Court stated: "The defense of qualified immunity shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 641, quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Smith Court further opined that:

> "In determining whether a particular right was clearly established at the time defendants acted, the Second Circuit has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant or official would have understood that his or her acts were unlawful." Id. at 641, citing Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991).

Federal courts have held "that a person has a clearly established right not to be arrested without probable cause." Cook v. Sheldon, 41 F. 3d 73, 78 (2nd Cir. 1994), citing Soares v. State of Connecticut, 8 F.3d 917, 920 (2nd Cir. 1993). Where, however, an

officer reasonably believes he has probable cause to arrest an individual, that officer's actions are protected by the doctrine of qualified immunity. See <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987). In <u>Cook v. Sheldon</u>, 41 F.3d. 73 (2nd Cir. 1994), the Court stated that:

> If an officer arrests the plaintiff without probable cause, the officer is, nevertheless, immune if he can show either that: (1) it was objectively reasonable for him to believe he had probable cause; or (2) officers of reasonable competence could disagree whether probable cause existed. See <u>Golino</u>, 950 F.2d at 870. If the officer makes either showing, he is entitled to qualified immunity, regardless of his underlying motives for arresting the plaintiff. See <u>Mozzochi v. Borden</u>, 959 F. 2d 1174, 1179-80 (2d Cir. 1992); <u>Magnotti v. Kuntz</u>, 918 F.2d 364, 367-68 (2d Cir. 1990). See also <u>Oliveira v. Mayer</u>, 23 F.3d 642, 649 (2d Cir. 1994) (There is qualified immunity when the officer "reasonably believes that a reasonably prudent police officer would have acted even though a reasonably prudent police officer would not have acted.") <u>Cook</u>, 41 F. 3d. at 78.

It was objectively reasonable for the defendant to believe reasonable suspicion existed to question the plaintiff as to whether he had attempted contact with the Cundys. As an initial matter, it should be stressed that the plaintiff was not placed under arrest. It is clear from the allegations of the Complaint that Chance was asked to appear at the police station for an interview. As discussed above, in August of 2002, Chance had phoned the Cundy residence on several occasions. On August 18, 2002, an officer of the Fairfield Police Department contacted Chance in response to a complaint filed by Cundy

that Chance had made harassing calls to his home. Chance was advised that he should not call the Cundys any more, as they did not welcome his contact. On February 4, 2003 and February 5, 2003, Cundy contacted the Fairfield Police Department alleging that Chance had come to his home and contacted him at work. Neither Lyddy nor Bravo had any reason to doubt the veracity of Cundy's allegations. (Lyddy Aff. ¶18.)(Bravo Aff. ¶ 23.) Given the plaintiff's criminal history and the prior warning given to the plaintiff, Bravo reasonably believed probable cause existed to question the plaintiff. Furthermore, Lyddy also felt probable cause existed to question the plaintiff. While the defendant determined the plaintiff had not trespassed upon Cundy's property, he is entitled to qualified immunity because it was objectively reasonable for him to believe reasonable suspicion existed to question the plaintiff as to whether he committed criminal trespass under the totality of the circumstances.

CONCLUSION:

For the reasons set forth above, the defendant, PETER BRAVO, is entitled to Summary Judgment, as there are no genuine issues of material fact in dispute as to the fact that he reasonably believed reasonable suspicion existed to question the plaintiff.

THE DEFENDANT,
PETER BRAVO

BY:_____
THOMAS M. MURTHA
MAHER & MURTHA, LLC
528 Clinton Avenue - P.O. Box 901
Bridgeport, CT. 06601
Phone No. 203-367-2700
Fax No. 203-335-0589
Fed. ID # CT22419

### CERTIFICATION

    This is to certify that a copy hereof has been sent, first-class mail, postage pre-paid, on this date, to all counsel and pro se parties of record:

Stanley Chance, Pro Se
99 Jetland Street
Bridgeport, CT 06605

Karen L. Karpie, Esq.
Murphy & Karpie, LLC
350 Fairfield Avenue, Suite 408
Bridgeport, CT 06604

BY:_____
THOMAS M. MURTHA
